## WILLIS et al. v. STATE.

### No. 3660.

Court of Civil Appeals of Texas. Beaumont.

June 19, 1940.

Llewellyn & Dougharty, of Liberty, and Morris & Bennett, of Beaumont, for appellants.

Thos. J. Hightower, H. A. Maynard, and Thos. A. Wheat, all of Liberty, for appellee.

O'QUINN, Justice.

This was an action in the district court of Liberty County by appellee, The State of Texas, against appellants, Mr. and Mrs. B. H. Willis, as owners, and certain other parties as lienholders, to foreclose a tax lien on about 17,000 acres of land in Liberty county for the years 1935 and 1936. By their answer, appellants raised the following defensive issues: (1) In raising the values placed upon the land by them in their rendition, the Board of Equalization of Liberty county "employed and followed an arbitrary rule or scheme in arriving at such increased values"; (2) The tax assessor of Liberty county received and accepted the renditions made by appellants, and the values placed by them upon the property, without noting on the rendition sheets a different value—because of that fact the Board of Equalization was without jurisdiction "to raise the values placed upon the property" by appellants; (3) The Board of Equalization, in its hearing on values, had no evidence before it except the testimony of appellant, B. H. Willis, in support of the rendition made by him, and, the action of the Board in raising the value was without support in the evidence; (4) The Board discriminated against appellants in raising their valuation, which denied them the

equal protection of the law and amounted to a taking of their property without due process of law, in violation of the Constitution of the United States; (5) Appellants made tender of the amount of the taxes due upon the rendition made by them.

On trial to the court without a jury, judgment was for appellee in the sum of $13,904.43, total amount sued for, from which appellants duly prosecuted their appeal to this court.

As their assignments of error, appellants have brought forward the propositions as numbered above, constituting their special defenses. They also assign that the delinquent tax record, as introduced in evidence, was insufficient to support the judgment, and there was "no proof that any tax was levied by the Commissioners' Court of Liberty county for the years in issue in this suit."

We pretermit a discussion of all assignments except that in raising appellants' values, as evidenced by their rendition sheets, the Board of Equalization employed and followed "an arbitrary rule or scheme." It was the contention of appellants that the Board of Equalization of Liberty county had an arbitrary rule or scheme "to the effect that acreage property was assessed at a maximum of Ten Dollars ($10.00) and a minimum of Five Dollars ($5.00) per acre without reference to whether or not it was improved land, without reference to its location, but agricultural land, grazing land, and commercial timber lands were assessed at Ten Dollars ($10.00) an acre, marsh lands, cut-over timber lands, and sandy lands at Five Dollars ($5.00) per acre." The evidence on that issue was as follows:

On the trial, the county judge of Liberty county, who was of counsel for appellee, made the following statement in open court as an incident of the trial, "We agree in so far as Ten Dollars ($10.00) being the maximum, Your Honor."

W. W. Jett, tax collector of Liberty county, after identifying the renditions made by appellants for 1935 and 1936, testified that the Board of Equalization raised "practically all" of appellants' renditions for the years 1935 and 1936; that he did not make any recommendation to the Board, and did not place any different value on the property; that the Board, in equalizing the value of the property for 1935 and 1936, followed an old set rule which had been in use for many years—that the maximum value placed on acreage was $10 per acre. We give his testimony on this point (Q. & A. reduced to narrative): "I know from my own knowledge and from my appearance before the Board of Equalization that they have an old set rule as to a maximum valuation for real estate in Liberty county, which was in effect in the years 1935 and 1936. Under this rule the agricultural part was not considered as much as prairie and timber—prairie and timber land. The maximum valuation placed on timber land was, as a rule, $10.00 per acre, regardless, and the minimum valuation was $5.00 per acre. The Board tried to follow that rule regardless of whether it was $5.00 land; it made no difference. The Court's idea was that anything that was prairie land was worth $10.00 per acre whether it was in the north, south, or east part of the county. The Board put a $10.00 valuation on the land if it was virgin timber, I mean that no property at all in the county was taken at a value—farm lands, lands outside of town—none was taken at a value of more than $10.00; if it was it was mighty little. All the land, irrespective of whether it was used for cultivation or grazing purposes, all was supposed to be taken at the uniform value of $10.00, but it was not always; where they knew it was prairie land; they took it for $10.00—sometimes they would think it was in timber when it wasn't. I am not acquainted with Mr. Willis' land and the land in that vicinity; I tried to go over that lower prairie, but that boggy pasture—impossible to go over that. I went behind them in sea marshes and bogged down."

Mr. C. P. Jackson, one of the Commissioners and a member of the Board of Equalization for the years 1935 and 1936 testified (Q. & A. reduced to narrative): "During the years 1935 and 1936, the Board of Equalization continued a previously adopted rule as to a maximum value to be placed on real estate in Liberty county outside of towns and cities; the maximum value was $10.00 per acre, the minimum value $5.00 per acre. After we arrived at a valuation, we took 60% of that valuation for the application of the tax rate. The $10.00 maximum valuation applied to prairie lands, farm lands, and commercial timber land. The $10.00 maximum applied to all lands within the county coming within that classification regardless of location, and regardless of im-

provements. The $10.00 maximum valuation applied uniformly to lands coming within the classifications I have named regardless of whether the land was on or near a highway—all farm lands, prairie lands, and commercial timber lands. The $5.00 minimum applied to cut-over timber land and soft marshy land not fit for cultivation at present. Just because the land might be prairie land did not take it out of the $10.00 maximum classification, unless it was swampy land. I do not recall that we had a variation there between $5.00 and $10.00. In other words, if the land was any kind of prairie land we put on it a $10.00 valuation, and on swampy land the minimum value of $5.00, for it wasn't fit for cultivation. We had a fundamental rule in adjusting valuations; for instance if one-fourth of a tract was timber land and the rest was prairie land, I, think we would put about $6.00 on it—that is my idea of equalization. I state that everybody was treated that way. The Board had no reason to want to discriminate against Mr. Willis; we treated him like we treated everybody else. At the time we fixed the value on Mr. Willis' land, in estimating the value of his swampy land, timber land, prairie land, and good commercial land—we used that old rule; we exercised the best of our judgment in arriving at the value. As I understand his land, it was about fifty-fifty; it would be about $7.50 per acre. In fixing the value on the land, if some of it was worth $15.00 an acre and some of it was worth $3.00 per acre—as far as we were concerned, there wasn't any $15.00 value. Under our rule, if all land was prairie it was assessed at $10.00; if it was cut-over land it was assessed at $5.00. We didn't adopt the rule of placing $5.00 and $10.00 an acre on the land; we just continued a rule that had been adopted previous to our election. Mr. Willis came before us and told us about his land; about his rice farming land and about the roads."

We take from appellants' brief the following summary of the testimony of Mr. Lewis Tanner, deputy tax collector of Liberty county: "He identified the record of assessments of property in Liberty County owned and rendered for taxation by the owners or agents for the year 1935, identified the Winnie Wickliffe tract in the James Martin 140 acres, which was assessed by the Board of Equalization at Fourteen Hundred Dollars ($1400); valuation for the year 1935. That the Vera M. Slay 112 acres was assessed at Eleven Hundred Twenty Dollars ($1120.00) for the year 1935; that the Andrew Bell two hundred acres in the Coronado survey was assessed at Two Thousand Dollars ($2000) for the year 1935; that the Harrison and Mecom tracts of 167 acres in the B. C. Franklin Survey were assessed at Sixteen Hundred Seventy Dollars ($1670); that that property is located just this side of the Fair Grounds just off of Highway 90; that Mrs. Slay's land is a mile from Liberty on Highway No.. 146. And with reference to the same records for 1936, the Wickliffe 148 acres in the James Martin were assessed at Fourteen Hundred Dollars (1400); Mrs. Vera Slay's 111 acres at Eleven Hundred Twenty Dollars ($1120); Andrew Bell 200 acres at Two Thousand Dollars ($2000); Harrison and Mecom 167 acres in the B. C. Franklin at Sixteen Hundred Seventy Dollars ($1670); A. C. Neyland 32 acres in the B. C. Franklin at Six Hundred Dollars ($600). That those were the final valuations upon which the property was accepted by the Board of Equalization, for taxation. That there are about sixteen thousand tracts of land in Liberty County. Lewis Tanner, being recalled as a witness for the State, identified an original map of a part of Liberty County and testified that he had gone through and identified some of the land on the valuation book; that the Meacham 320 acres were rendered at Sixteen Hundred Dollars ($1600) Five Dollars ($5.00) an acre; that this land was in the V. Barrow. The Davis tract of land of 805 acres was entered at Eight Thousand Fifty ($8050), Ten Dollars ($10.00) an acre, which is around or near some of Mr. Willis' land; that the J. S. Cullinan in T & N O 15, of 639.46 acres was rendered at Six Thousand Three Hundred Ninety Dollars ($6390), Ten Dollars ($10.00) an acre. That it is in close proximity to Mr. Willis' land. That some joins it above and some of it to the west. The Charley Welch 640 acres in T & N O 11 was rendered at Sixty-four Hundred Dollars ($6400); which is Ten Dollars ($10.00) an acre. That it is near some of Mr. Willis' land, joins some of it. That the J. S. Cullinan 310 acres in T & N O 313 was assessed at Thirty-one Hundred Dollars ($3100) or Ten Dollars ($10.00) an acre, which is right near Mr. Willis' land. The W. S. Swilley Railway Survey No. 17, 320 acres was assessed at Thirty-two Hundred Dollars ($3200), or Ten Dollars

($10.00) an acre, which is in close proximity to some of B. H. Willis' land, right amongst it. That E. W. Boyt has one tract of land, 320 acres, 28 on Thos. Moore 320 acres at Thirty-two Hundred Dollars ($3200); O. P. Hassell 320 acres at Thirty-two Hundred Dollars ($3200), which would be Ten Dollars ($10.00) per acre, which is in close proximity to Mr. Willis' land, 640 joins his on the east and 34 on the T. L. Carroll, E. W. Boyt 320 acres is assessed at Thirty-Two Hundred Dollars ($3200), which is Ten Dollars ($10.00) an acre, in close proximity to some of Mr. Willis' land. In Sec. 36, E. W. Boyt has 640 acres assessed at Sixty-four Hundred Dollars ($6400), or Ten Dollars ($10.00) an acre in close. proximity to Mr. Willis' land. That B. H. Willis' land in T & N O Sec. 29, 640 acres rendered by B. H. Willis for Forty-seven Hundred Dollars ($4700), which is Seven Dollars Fifty Cents ($7.50) an acre. That Mr. Willis' land, however, was taxed at Ten Dollars ($10.00) an acre. That the land belonging to Mr. Haskell joins his and is put in at Ten Dollars ($10.00) an acre. That all of this land in the same vicinity of Mr. Willis' land is placed on the rolls and taxed at Ten Dollars ($10.00) an acre."

We take from appellants' brief the following summary of the testimony of J. M. Rich: "Mr. J. M. Rich, a witness for the defendants, testified that he had lived in Liberty County about all his life; that his business was real estate, farming and stock raising; that he had been in the real estate business for the last twenty or twenty-five years; that practically all of his activities had been in Liberty County, and that he had become familiar with the values of real estate in Liberty County during the last twenty years; that he had been to Hardin, Romayor, Cleveland, Dayton, Esperson Dome, and different places over the county; that he was familiar with the location of the tract of land owned by S. S. Wickliffe on Highway No. 3, east of Liberty in the James Martin Survey, commonly known as the golf course, and that he would certainly say it was worth Fifty Dollars ($50.00) an acre. That he was familiar with the class of land in the Coronado Survey, the Andrew Bill farm on Highway No. 146 containing over two hundred acres, and that the cultivated area of that particular tract was worth conservatively, Twenty-five Dollars ($25.00) an acre, maybe higher than that. That he was familiar with the tract of land known as the Mecom Subdivision located on the Wallisville Road in the Franklin Survey; that he would consider it almost city property, and that in 1935 and 1936 it was worth One Hundred Dollars ($100.00) an acre, some of it, not all of it. That he was also familiar with the Allen Neyland property where George's Cafe is located, also in the B. C. Franklin Survey, and that he would say that it was about the same price, basing it entirely on its proximity to the city and highway. That he was acquainted with the tract of land at the foot of the hill adjoining the town of Dayton on the eastern part of the South Liberty Town League, at one time known as the Fred Barton League, and that its value would be from Fifty Dollars ($50.00) to One Hundred Dollars ($100.00) an acre for the same reason, close to town. That in arriving at valuations, he takes into consideration the proximity of the property to settlements, churches, schools, and things like that, and that there is a great deal of property in Liberty County along Highway No. 3 and along Highway No. 146 and along the highway leading from Raywood to Hull, and other improved highways in the County, that have similar values; that for example the Allen Neyland property, which he has identified in the B. C. Franklin Survey, is more valuable than the tract of land located in approximately the southeast corner of Liberty County; that the Neyland property in 1935 and 1936 was worth three or four times as much as land located down there in Mr. Willis' tract of land; that he knows where Mr. Willis' lands are and that he is familiar with them, and, while it will raise just as much rice, it is less valuable than similar lands located on Highway No. 61 between Devers and Anahuac. That in fixing valuations he takes into consideration the character of improvements on the property, and, all other things being equal, stuff close to Devers and Raywood, would be worth more than stuff in the southeast corner; that all rice lands in Liberty County are not of uniform market value; that the availability of water would have a lot to do with the worth; that lands with the minerals reserved of a one-thirty-second to a one-sixteenth reserved would not be worth as much as lands of no reservations, but he did not know how to fix the value. That he knows the general character of the lands in the southeastern part of Liberty County, some of it is prairie and some

of it is timber lands and scrubby timber, and that taking that land as a whole, he would say a fair market value of the lands in 1935 and 1936 in that vicinity would be Five Dollars ($5.00) or Ten Dollars ($10.00) or Fifteen Dollars ($15.00). That he is familiar with the location of Highway No. 3 as it passes through Liberty County; that there are about 35 miles of the highway; that he is familiar with State Highway No. 146 as it passes through Liberty, about forty miles of it. That he is acquainted with the road commonly known as the Dayton-Cleveland Road; that it is a paved highway of concrete; that Highway No. 3 is a paved highway; that there are about twenty-six or twenty-eight miles of the Dayton-Cleveland Road; that he is familiar with the road from Raywood going in a northeasterly direction by way of Hull to Batson; that there is a paved road past Hull and then just half of it is paved; that there are about fifteen miles of it in Liberty County. That he is familiar with the location of State Highway No. 61 from Devers south toward Anahuac; that it is a macadamized road, and that there are about ten miles of the road in Liberty County. That for two or three miles out of Liberty on that road the market value back from the highway half a mile would be Twenty-five Dollars ($25.00), some of it is not so much, depends entirely on the kind of tract it is. That there is a great difference in the nature of the soil on that road. That along those roads and especially near those towns and cities mentioned, Dayton and Cleveland, Liberty and Raywood, Hull, Daisetta, and Devers, during the year 1935 and 1936 land was considerably more valuable than lands located as Mr. Willis' is, or a good portion of it is, in the southeast portion of the county. On cross examination, he testified that Liberty County has as big a variety of soil as any county he knows anything about. Some of it is absolutely no good for anything and some of it is as good as anything in Texas. That he is acquainted with the seventeen thousand-acre tract of Mr. Willis' land; that he has some land within three or four miles of it, part of it being rice land. That he renders it for taxes; that it has been rendered for Ten Dollars ($10.00) an acre most of the time; that he has argued with them about some of it but has not got very far; that he pays taxes on that basis, that is, Ten Dollars ($10.00) an acre. Part of his land is within two miles of Mr. Willis' land. Some of his land is not as good, some better, and some about the same as Willis', but taking it as a whole, it would be approximately the same. That he has a place down out of Raywood in that part of the country; that he knows other farmers down there and has dealings with land owners down there, and that, as to whether it has the same value as his land, rice land is a peculiar thing, the older it is and the more improved it is, the sorrier it is for rice; you wear it out for rice, it gets foul and full of weeds and that is the reason, he says, some of it close to the highway is not as valuable as some off the highway. That he renders his land down south of Raywood for Ten Dollars ($10.00) an acre, most of it, except the Devers part, and he thinks they stuck him Five or Six Dollars an acre on that. That he pays taxes on that basis. That the value he placed on the Neyland land and the reason for the high value he placed on it was its close proximity and use for city purposes. On redirect examination, he stated that he knows the buildings and improvements on the Neyland tract which is a thirty-two-acre tract; that they have a filling station on the corner, a restaurant and night club, parking lots, tourist camps, and that he believes Price has a residence on the lower end and some other buildings. That it is a comparatively recent dwelling house of brick veneer, looks like a five or six room house. That he has never been in George's place, but he has seen a good many tourist campers and it is a pretty nice building, having tourist camps in connection. That he is familiar with the tract belonging to Mrs. Slay on Highway No. 46; that the market value of that property is along about the lines he has talked, Fifty Dollars ($50.00) an acre property. On recross examination, he testified that he does not know whether or not they render the Neyland tract as a whole tract or cut up in little tracts, and the same is true with reference to George's place; that he has never checked that. That you frequently have to let rice land lay out, some of it for five years, for the purpose of improving the soil. The longer you let it lay out the better it is. That when not using it for rice farming you can graze it, the usual practice is for rice farmers to have a bunch of cattle. That there is a State Highway running through Mr. Willis' land which he estimates is two or three miles anyway, or about five and one-half miles, which would touch five or

six sections of land depending on the way he cuts it and where it touches it. That down there on the Wallisville Road where he testified land half a mile on each side was worth Twenty-five Dollars ($25.00) an acre, that it might not be that far, some of it would reach into the bottoms, and where it reached into the bottoms it would not have that much value, that to be specific about it, he had been offered One Hundred Dollars ($100) an acre on the highway last year and this year, since the paving was put in and that back in 1935 and 1936 before they built the highway down there there would not be much difference because they already had a highway; it was not like going through new country. On redirect examination, he testified that that portion of Mr. Willis' land through which Highway No. 3 runs is not anything like as valuable as that of Neyland's land; that the market value of some tracts of land would be vastly different; that the same is true of Mr. Willis' land and Mrs. Slay's land; that you would have to base the value of the location of the property; that he would not give you fifteen cents for some of the land. On recross examination, he testified that land down the Wallisville Road for a half mile back on each side would be worth something like Twenty-five Dollars ($25.00) an acre, but the same is not true with regard to all the main highways in the county, some of them are farther back. That it is not true with regard to Highway No. 3 through Mr. Willis' land. It is much farther away from town. As to the value of that land that depends on the size of the tracts. You can buy a little tract of land close to town and put up a filling station, a night club, or something else, but you would not have much luck with either one on Mr. Willis' land because it is too far away from town. That Mr. Bell's land is about the best farm land in the whole of Liberty County and that the value of land on either side of that highway would be Fifty Dollars ($50.00) an acre, Mr. Bell's land. Talking about Mr. Willis' land along the highway half a mile back, beginning when you strike Mr. Willis' land toward Beaumont until you get to the other side of it, that land along there is marsh, about the sorriest part of Mr. Willis' land as far as farm land is concerned, unless it is drained. He has got other rice land of better value. About the value of that land in big tracts, Five or Ten or Fifteen Dollars, nor over Twenty-

five Dollars an acre would be the market value; that he would not have twenty acres of it, he would not know what to do with it. You could not sell that in twenty-acre tracts because it is not the same nature of soil on the highway. If you cut it up in twenty-acre tracts it would be much less valuable than in a section. The witness Rich was the only witness besides B. H. Willis, who qualified as knowing the values of those lands."

We take from appellants' brief the following summary of the testimony of appellant, B. W. Willis: "Defendant B. H. Willis testified that he was acquainted with the values of the property he rendered for taxation for the years 1935 and 1936; that he had bought property in that vicinity; that the values he placed upon his property in his renditions represented the reasonable market value; that he had various types of land; about four-fifths to five-sixths of it being prairie and one-sixth scrubby timber and some of it fairly good timber, but all cut-over in the last twenty years; that five-sixths prairies land is possible agricultural land, some of it without drainage, some of it, back down next to Double Gum, low, wet, and boggy, hardly get in and out at all. That for two or three months in the winter can't get in and out with the school bus at all, it being property where a road used to go through called Willis' Lane and Devers' Woods, where they had such bad places in the highway; that it isn't all the same class of property but is all pretty close together, being in about the same neighborhood; that during the years 1935 and 1936 it was mostly impossible to get in and off the lands from the concrete highway; that the roads back through the property could be travelled in good weather but not in bad weather; that about sixty to seventy percent of the time you could go most anywhere but about 25% of the time you could go only where you have hard surface roads, and that 25% of the time the lands are not accessible by travelled highways, and that such condition made the lands much less valuable. That most of his land lies south of the concrete highway and that the entire lands for the years 1935 and 1936 were in that condition. That the country is sparsely settled. That he has some improvements on his property and that the children living in that vicinity and on his property could not get to school during wet weather; that there were no schools in 1935 and 1936,

located on his land; that nearly all of the land has minerals reserved or royalties reserved, and that such condition makes it less valuable. That he received notice of the action of the Commissioners' Court, raising his values, and appeared before the Commissioners' Court at the time stated, at the hearing on the valuations, and offered to produce proof to the Board of Equalization as to the value of his property and why it should be less valuable; that the Board of Equalization did not seem to be open to proof, just seemed to be $5.00 and $10.00. That is all the answer he got. That the Court informed him they were not taking anything under $5.00 and nothing over $10.00; that everything went in at either $5.00 or $10.00 per acre. That his farming lands would be as valuable as other farming lands in the County if it had roads through it and was well drained. That he has no good roads and very little drainage, but that they have it assessed at $10.00 an acre, being the maximum. That they put a value of $10.00 per acre on the lands close to the highway and also the lands back from the highway. He further testified on cross examination that in 1935 he had about one thousand of the seventeen thousand acres in cultivation on a rental basis of Three Dollars ($3.00) per acre; that he got a little on pasture; that he had some twelve thousand acres that could have been farmed, but the Federal regulations would not permit him to farm any more than one thousand acres; that he used some of it himself for pasturage and leased out small tracts at Twenty-five Cents (25¢) an acre. That the lands in his vicinity were about the same as the Esperson tract, south of Dayton, as to getting in and out. That he had been discriminated against by Liberty County in the expenditure of bond money for roads, and also his lands were valued too high in proportion to other lands in the County. That Mr. Rich and Mr. Boyt owned lands around him, and that he does not see much difference in values except that their lands lie between his and one of the improved highways, and that that would make their lands more valuable. That the one-sixth of his land which is timber land, amounting to approximately three thousand acres, is north of the highway; that the timber was cut off about 1917 and that he would figure the timber worth probably Four Dollars or Five Dollars an acre. That he has picked up old buildings and rebuilt them on the farms to hold hay, shelter cattle, and things like that; that he built some tenant houses several years ago, seven or eight of them, every one in bad shape, most of them idle and empty only three of them being used; that the only other improvements he has is open constructed sheds for cattle, not of much value; that in 1935 and 1936 he was paid about Two Thousand Dollars ($2,000.00) on his entire property for benefit payments by the Government. That the Commissioners' Court, while meeting in official body, informed him that the values of land were fixed at Five Dollars ($5.00) and Ten Dollars ($10.00) an acre basis; that he offered to show them why his valuation should not be raised, many times. That he told them all that he has gold on the witness stand. That they heard what he said but did not give him any relief. On re-direct examination, he testified that when he contested the raise in valuations, the Board of Equalization just told him that they had decided or ruled that all lands would be valued at Five Dollars ($5.00) or Ten Dollars ($10.00) per acre, that his would be the same way. That rice lands near highways are more valuable than rice lands located away from highways; that the entire bunch of tenant houses on his land are practically worthless at this time and were not a whole lot better than in 1935 and 1936; that they were less valuable than other houses where people live in Liberty County; that they were not in livable condition. He further testified that the timber land he spoke of being where the timber was worth Five Dollars ($5.00) an acre, that the timber was the only thing of value on the land; that if the timber was taken off the land would just help to hold the world together. That he had purchased the land in the Robert Burrell Survey adjacent to his other holdings during the last eighteen months for Six Dollars ($6.00) an acre. That the price he paid was the reasonable market value, and that he was the only one who was willing to pay that for it, and that it was not worth any more than Six Dollars ($6.00) per acre in 1935 and 1936."

Mr. D. M. Kelly, one of the County Commissioners, testified (Q. & A. reduced to narrative):

"I know of no land in Liberty county that we valued for less than $5.00. It is pretty hard to say definitely whether we placed more than $10.00 on any farm land; probably might be some, taking into con-

sideration the improvements, we put more on than $10.00. It was not the general policy of the Board to place a value of $10.00, or a value of $5.00 on all land. Where part of the land was worth $10.00 and a part was worth $5.00, we arrived at some intermediary value, some value between $10.00 and $5.00, in order to equalize the value of the whole tract. We have lots of land in Liberty county we valued I would say ranging from $5.50 to $8.00 on up to $10.00. In fixing the values we tried to place a reasonable value on all properties alike. We did not deliberately or maliciously discriminate against Mr. Willis' land; we tried to treat him as we treated the other tax payers, and the final value placed on his property was arrived at in the exercise of our honest judgment. Well, most of the property—we accepted acreage where a man had his home if he had 60 acres or 100 acres the land was his farm, we taken that land generally at $10.00 an acre. As far as I remember, I do not believe we have raised any of the values along the highways any more than other places I know of, except in close to the city properties and lots, etc. We didn't have an absolute rule that prairie land and farm lands went on the rolls at $10.00 an acre or that cut-over lands went on the rolls at $5.00 an acre.

"Q. You said there was an absolute rule that farm lands and prairie lands went on the rolls at Ten ($10.00) Dollars an acre. I am asking that question, now, with reference to tracts of land entirely farm land or entirely prairie land. In other words, if a man owned a tract of land a hundred (100) acres, all in cultivation, what was the rule of the Court with reference to valuation? A. We generally put that on at Ten ($10.00) Dollars.

"Q. You say you generally did it. Didn't you always? A. I might say 'yes', and I might make a mistake. I don't know all the tracts of land. Some man might bring in a hundred (100) and we might render it Seven ($7) Dollars or Five ($5) Dollars, not knowing it was all in cultivation.

"Q. How long were you on the Court? Four (4) years? A. Six (6) years."

From the testimony in the record, we think it conclusively appears that the Board of Equalization of Liberty county, in assessing values on acreage land, operated under an old rule of a $10 maximum and a $5 minimum, and that regardless of improvements and of the location of the property. It appears that Liberty county has many miles of concrete roads, and that the acreage on these roads, even as far back as two miles, has a much greater value than land off the roads. But it appears that such land is assessed on the same basis of value as lands remote from the roads. It also appears that land near the towns and cities in Liberty county, having a high value of $100 per acre, was assessed under the general rule. Under the general rule, land not worth fifteen cents an acre was assessed at a minimum of $5 and land worth more than $100 was assessed at the maximum of $10. Article 8, § 1, of the Constitution, Vernon's Ann.St., provides that "taxation shall be equal and uniform." Our courts have uniformally condemned assessments made under a general rule or scheme whereby property, regardless of its location, or situation, or market value, is assessed at the same general valuation. In Rowland v. City of Tyler, Tex.Com.App., 5 S.W.2d 756, 757, 760, Judge Leddy said:

"If, as is held, the reasonable cash market value is the true criterion, then it follows that if a board of equalization adopts a plan or scheme which is fundamentally wrong by which values are arbitrarily determined, then the plain provision of the Constitution has been violated. * * * The courts have frequently, and we think properly, condemned the action of boards of equalization in taking any one particular element as a rigid standard by which values of real estate shall be determined. The true value of real estate cannot be arrived at unless equalization boards give consideration to all proper elements that are determinative of the market value thereof. The decision in the case of People ex rel. Fitchburg Ry. Co. v. Haren, 50 Hun 605, 3 N.Y.S. 86, clearly states the true rule that should guide such boards in valuing real estate for purposes of taxation, wherein it is said:

" 'Many considerations must have a share in determining this value. Among them are actual sales of the property, or of similar property, and the earning capacity of the property itself. No one consideration is conclusive. All may be properly taken into account. Sometimes houses of large cost will rent for only a small interest on the cost and on their value in the market. Other kinds of real

estate may bring a large income upon their cost and on their value in the market. So that to take the earning capacity as the sole measure would be incorrect, while yet it may properly have its influence.' "

See, also, Constitution of Texas, Art. 8, Sec. 18; R.S.1925, Art. 7206; Ogburn v. Ward County Irrigation Dist., Tex.Com. App., 280 S.W. 169; Rowland v. City of Tyler, Tex.Com.App., 5 S.W.2d 756; State v. Richardson, 126 Tex. 11, 84 S.W. 2d 1076; Lively v. M. K. & T. Ry. Co., 102 Tex. 545, 120 S.W. 852; Nederland Independent School Dist. v. Carter, Tex. Civ.App., 93 S.W.2d 487; Poteet v. W. T. Waggoner Estate, Tex.Civ.App., 96 ,S.W. 2d 405; Howth v. French Ind. School Dist., Tex.Civ.App., 115 S.W.2d 1036 (See also Opinion by Commission of Appeals this case, 134 S.W.2d 1036, not yet [Reported in State Reports]); Power v. Andrews, Tex.Civ.App., 253 S.W. 870; Garza Land & Cattle Co. v. Redwine Ind. School Dist., Tex.Civ.App., 282 S.W. 905; Brown et al. v. First National Bank of Corsicana et al., Tex.Civ.App., 175 S.W. 1122; Slaughter v. Sundown Ind. School Dist., Tex.Civ.App., 41 S.W.2d 478; Santa Rosa, Inc. v. Lyford Ind. School Dist., Tex.Civ. App., 78 S.W.2d 1061. On the authorities cited, it necessarily follows that the judgment of the Board of Equalization, raising the rendition values as fixed by appellants, on their property for the years 1935 and 1936, is void and must be set aside.

■ On our judgment declaring unlawful the action of the Board of Equalization in raising the assessment on appellants' property, the law declares that the original assessment of the property made by appellants determines the amount of taxes due by them. On this proposition, speaking for the Supreme Court in State v. Richardson, 126 Tex. 11, 84 S.W.2d 1076, 1078, Judge German said: "It is well settled that if a rendition of property be made by the owner, and if the board of equalization by adopting some arbitrary standard, or by failing to hear evidence, or in some other respect fails to follow the provisions of the statute (see articles 7211 and 7212 of the Revised Statutes of 1925), fixes a value that is illegal and is afterwards set aside, the taxpayer's original rendition prevails as a basis upon which taxes are to be paid. Brundrett v.

Lucas (Tex.Civ.App.) 194 S.W. 613; Rowland v. City of Tyler (Tex.Com.App.) 5 S.W. (2d) 756; Ramey v. City of Tyler (Tex.Civ.App.) 45 S.W. (2d) 359. In such case, if the taxpayer has made timely tender upon the basis of his rendition, he cannot be required to pay interest and penalties. Ramey v. City of Tyler, supra."

On the issue of "tender" by appellants, we quote as follows from their answer:

"The defendant, B. H. Willis, has repeatedly offered to pay his taxes based upon his renditions, but the plaintiff has always refused to accept same, though defendant has tendered payment thereof before they became delinquent, and the defendant here and now tenders into court the payment of the taxes due upon his said property in accordance with the renditions heretofore made by him and hereby referred to.

"Wherefore, defendants pray that the valuations placed upon defendants' property, as alleged in plaintiff's petition, be canceled, annulled, and held for naught; that the renditions as made by the defendant, B. H. Willis, be taken as a basis for calculating the taxes due thereon, which the defendant, B. H. Willis, here now offers to pay and tenders into Court, and defendants further pray for general and special relief, to which they may be entitled, for costs of suit, etc."

■ Appellants have not brought forward in their brief any testimony to the effect that they made timely tender for the taxes due on their rendition. So, though appellants are due only the taxes on the rendition made by them, it must be held that they were delinquent in paying such taxes and judgment should be against them for the amount of the taxes, as per their rendition sheets, and on these taxes they should be charged interest and penalty. The clerk is directed to make the proper calculation as to the amount of taxes, interest, and penalty so adjudged against appellants, and to enter judgment accordingly.

The judgment of the lower court will be reformed, and as reformed here rendered against appellants in favor of appellee for the amount of taxes due on the basis above stated.

Reformed and affirmed.