REES v. STATE.

No. 5775.

Court of Civil Appeals of Texas. Texarkana.

March 6, 1941.

Rehearing Denied March 27, 1941.

Hardy Moore, of Paris, and J. M. Lasater, of Naples, for appellant.

Starnes & Pharr and Edgar Hutchins, all of Greenville, and Boyet Stevens and George French, both of Daingerfield, for appellee.

WILLIAMS, Justice.

This is a suit for taxes and for foreclosure of tax lien filed by the State of Texas in behalf of itself, Morris County, and certain political subdivisions of the county, to recover of Evan Rees, defendant below, the sum of $3,188.54 allegedly assessed and due as taxes, interest and costs against twelve tracts of land, aggregating 4,800 acres, owned by defendant. Taxes for the years 1919, 1931, 1932, 1933, 1935, 1936, 1937 and 1938, are involved.

To the first amended original petition upon which trial was had, appellant interposed a general demurrer and a general denial. No assignment of error attacks the sufficiency of the amended original petition in stating a cause of action to support the judgment rendered, and its allegations will not be detailed. Appellant urged in his answer and asserts in this appeal that the assessments of taxes so made were invalid, being in contravention of Sections 1 and 20 of Article 8 of the Texas Constitution, Vernon's Ann.St., in that the properties were not assessed during the years involved at their fair cash market value, nor on an equal and uniform basis with other property of like kind in the county. The defense urged is more clearly reflected in the following quoted portion of the answer reading, "That in valuing defendant's property for tax purposes during the years involved, the taxing authorities were motivated by a desire to raise a certain amount of revenue for Morris County, without consideration of the value of the property sought to be taxed, and without considering the value of the defendant's property in relation to other property of like kind and that had defendant's property been taxed during the years involved on the same basis as other property of a similar kind in proportion to its value, the taxes would not have amounted to more than 50% of the amount involved in this suit." At the close of the evidence, the court peremptorily instructed the jury to return a verdict for the plaintiff. Judgment was entered against appellant for the amount sued for, together with foreclosure of tax lien against the respective tracts in the amount found to be due against each.

During the years involved this land was assessed at $3 an acre, except at $3.25 for 1932. Appellant's land is situated between White Oak and Sulphur rivers and from 50 per cent to 80 per cent is subject to overflow. Seventy-five acres have been cleared and were cultivated up to 1935. Its chief value comes from its timber and use for grazing purposes. Through the years timber has been cut and is now being cut from the property. The overflows are gradually destroying its value for grazing purposes. Portions of the land from time to time have been under oil and gas leases from which yearly rentals have been received. Appellant's witnesses valued the land at $3 or $4 an acre in 1931; $2.50 in 1938; never worth as much as $3 an acre; $2 an acre since 1931, not over $2 an acre. The Heard tract of land in the general area was assessed for taxes at $4 an acre for 1933, 1934 and 1935, and at $3 for subsequent years. Beggs rendered his tract of 160 acres at $3 or $3.75 an acre. Renditions of two others tracts in the area were $3 or $4 an acre. The testimony did not disclose the valuation placed upon any other real estate situated in other

parts of the county. A large part of the evidence dealt with the improvements, extent of overflow, and use of above tracts in comparison with that owned by appellant. It may be said that appellant's land was not as valuable when these various elements are considered.

Appellant did not testify. The evidence does not disclose if appellant did or did not render the property for taxes. If he did, there is no contention made in his pleadings or on this appeal that the Commissioners' Court sitting as a Board of Equalization raised the values of any rendition, nor that the tax assessor did so. It was admitted that the 1919 taxes were properly assessed, and during the trial appellant tendered the amount due on same. The county judge of Morris County for 1929 to 1935, a commissioner of the county for 1930 to 1936, and a deputy tax assessor testified to the schedule or plan used by the county during the period of time to assess property for taxation. The valuation placed on this land and other real estate in Morris County was supposed to represent 60 per cent of its actual value. "We didn't use any method, but as an Equalization Board we tried to get 50% to 60% of the actual value." "We valued the land at 60% of its value." "We valued each farm so much and tried to equalize every farm the same according to what his land was worth and tried to keep it down below the market value; personal property about the same, might have been less than 60% and maybe a little more; bank stock was figured at fifty some-odd." In response to inquiry how bank stock had been assessed, the deputy assessor testified that the capital and surplus of a bank was assessed at 50 per cent; and as high as 55 per cent, but could not say as to 60 per cent; that any land owned by it was figured in as part of the capital.

The county judge testified that in 1932 or 1933 when the county first began to operate under the Budget Law, Vernon's Ann.Civ. St. art. 689a—9 et seq., they had to figure the income and the expenses and "had to raise the tax to meet the budget;" "Well, possibly we raised the tax some. I wouldn't be sure, but it seems to me like we had to raise the tax a little bit. Before the budget law became effective you could issue warrants and just continue to issue warrants, and after the law went into effect you could not, and I know we had to raise the tax the first year to meet the budget. This budget requirement was new to us, and it gave us all the headache." If it be assumed that this witness intended to mean that they had to raise the valuation and did so, this record reflects an increase of 25 cents an acre for the year 1932, the years prior and subsequent thereto being at $3.

▮▮▮ The testimony of these officials that they tried to value each tract of land in the county at 60 per cent of its value and personal property about the same, there being no evidence offered of a contrary intent, would not warrant a conclusion that the taxing authorities had acted in bad faith or arbitrarily without regard to value in fixing valuations. The testimony of said officials that they had not adopted or used any other method than above stated, there being no evidence to the contrary, would not have supported a jury finding, if submitted to them, that the taxing authorities had assessed this land under a rule or scheme as condemned in Willis v. State, Tex.Civ.App., 142 S.W.2d 385, and the authorities there collated, namely, "The assessment of property regardless of its location or situation or market value at the same general valuation," or that "the equalization board had used an illegal, arbitrarily or fundamentally wrong scheme in making the assessment." The evidence offered by appellant, when viewed in its most favorable light, may reflect an overvaluation, and when compared to other lands in the area might indicate a lack of uniformity. If it be conceded that this evidence shows an overvaluation or a lack of uniformity in assessing the value when compared to other land in the general area of this, such under the other uncontroverted facts of this record would not present a jury question. In State v. Mallet Land & Cattle Co., 126 Tex. 392, 88 S.W.2d 471, 472, applicable to above observations and to the evidence here, it is stated: "No testimony was introduced tending to show that the board of equalization acted in bad faith in fixing the amount of taxes. The rule has been repeatedly announced that, in the absence of fraud or illegality, the action of a board of equalization upon a particular assessment is final; and, furthermore, that such valuation will not be set aside merely upon a showing that the same is in fact excessive. If the board fairly and honestly endeavors to fix a fair and just valuation for taxing purposes, a mistake on its part, under such circumstances, is not subject to review by the courts."

In addition to the authorities there collated, see Allen v. Emery I. S. Dist., Tex. Civ.App., 283 S.W. 674; Sparks v. State ex rel., Tex.Civ.App., 27 S.W.2d 918; Brundrett v. Lucas, Tex.Civ.App., 194 S.W. 613; Early v. City of Waco, Tex.Civ.App., 3 S.W.2d 131; Hinkson v. Lorenzo I. S. Dist., Tex.Civ.App., 109 S.W.2d 1008; Simkins v. City of Corsicana, Tex.Civ.App., 86 S.W.2d 792. We pretermit a discussion of the provisions of Section 20, Article 8, Texas Constitution, for therein it is stated: "This amendment shall be effective January 1, 1939." The assessments here involved were made prior to above date. 16 C.J.S., Constitutional Law, § 40, p. 83.

Appellant asserts under his first two propositions that "The deputy tax assessor and collector of Morris County should not have been permitted to testify, over timely and proper objection, that the appellant owed taxes, the amount of same, and the tracts against which they were assessed, because the witness purportedly testified from a copy of the original tax rolls of Morris County, referred to in the statement of facts as the 'Delinquent Tax Record,' as it was not shown to be a certified copy or based upon authenticated records."

The witness Cason, after identifying himself as the Deputy Tax Collector of Morris County, testified that he then held in his hands "The Delinquent Tax Record of Morris County, Texas;" that "it contains all the delinquent taxes due Morris County from 1919 to the present time." He further testified that it was not the original record in the tax office, or the original assessment made against each taxpayer; that the original tax roll and all the entries from that tax roll after July 1st each year is transferred to form No. 18. And further:

"Q. If I understand your statement, you have a rendition sheet made by the tax payer and then you have an assessment roll, and then after July 1st if the tax is not paid then you place it on the delinquent tax roll? A. No, sir; to form 18, and then to the delinquent tax record.

"Q. Do you submit that form 18 to the Comptroller of the State? A. Yes, sir; he gets one and we keep one.

"Q. And then you put them on that delinquent record? A. Yes, sir."

Over appellant's objection "that such delinquent tax record was not authenticated as required by law," the deputy tax collector was permitted to read and testify from his record the taxes assessed and delinquent against each tract and for each of the years involved. Article 7326, R.C.S. of 1925, reads: " * * * All delinquent tax records of said county in any county where such suit is brought shall be prima facie evidence of the true and correct amount of taxes and costs due by the defendant or defendants in such suit, and the same or certified copies thereof shall be admissible in the trial of such suit as evidence thereof. * * *"

It is thought that the foregoing statutory provision when tested by the general denial interposed by appellant is determinative of this proposition against him. Crocker v. Santo Consol. I. S. Dist., Tex. Civ.App., 116 S.W.2d 750.

The judgment of the trial court is affirmed.